997 P.2d 42

Mila BOCALBOS, Claimant–Appellant,

v.

**KAPIOLANI MEDICAL CENTER FOR WOMEN AND CHILDREN and John Mullen & Co., Inc., Employer/Insurance Carrier–Appellee.**

No. 20719.

Intermediate Court of Appeals of Hawaiʻi.

March 9, 2000.

Certiorari Denied April 20, 2000.

Mila Bocalbos, claimant-appellant, on the briefs, pro se.

Robert C. Kessner and Beverly S.K. Tom (Kessner Duca Umebayashi Bain & Matsunaga), on the briefs, for employer/insurance carrier-appellee.

WATANABE, ACOBA, and LIM, JJ.

Opinion of the Court by ACOBA, J.

We hold in this appeal[1] from the March 14, 1997 "Second Amended Order and Decision" of the Labor and Industrial Relations Appeals Board (the Board) by Claimant–Appellant Mila Bocalbos (Bocalbos) that Bocalbos was entitled to medical care, services, and supplies as "the nature of [her] injury require[d]" pursuant to Hawai'i Revised Statutes (HRS) § 386–21 (1985). Accordingly, while we respect the Board's extensive efforts to resolve her claim, we conclude the

---

1. This case had been dismissed by this court in *Bocalbos v. Kapiolani Med. Ctr.*, 91 Hawai'i 137, 980 P.2d 1011 (App.1998) (mem.), for lack of appellate jurisdiction on the basis that the order of the Labor and Industrial Relations Appeals Board (the Board) was not a final appealable order. The Hawai'i Supreme Court granted certiorari and held that "a decision of the [Board] that ... finally adjudicates the matters of medical and temporary disability benefits is an appealable final order under [Hawai'i Revised Statutes (HRS)] § 91–14(a) [ (1993).]" *Bocalbos v. Kapiolani Med. Ctr.*, 89 Hawai'i 436, 443, 974 P.2d 1026, 1033 (1999). Accordingly, the supreme court remanded the case to this court for a decision on the merits. *Id.*

On November 16, 1999, we issued a decision in this case. On November 24, 1999 and November 26, 1999, Employer/Insurance Carrier-Appellee Kapiolani Medical Center for Women and Children (Kapiolani) and John Mullen & Co., Inc. and Claimant–Appellant Mila Bocalbos (Bocalbos), respectively, filed motions for reconsideration. Because we chose to modify the original decision, on January 18, 2000, we vacated the decision issued on November 16, 1999, and thereafter issued this opinion.

Board's denial of coverage for orthodontic[2], orthopedic,[3] and prosthodontic[4] treatments claimed by Bocalbos as necessary for treatment of a temporomandibular joint (TMJ) disorder or syndrome (TMJD) was clearly erroneous and wrong and that Employer–Appellee Kapiolani Medical Center for Women and Children (Kapiolani) and Insurance Carrier–Appellee John Mullen & Co. (collectively, Employer[5]) are responsible for such treatment.

## I.

"Temporomandibular joint syndrome" is defined as a

dysfunction of the temporomandibular joint marked by a clicking or grinding sensation in the joint and often by pain in or about the ears, muscle tiredness and slight soreness upon waking, and stiffness of the jaw or actual trismus; it results from mandibular overclosure, condylar displacement, or stress, with deforming arthritis an occasional factor.

*The Sloane–Dorland Annotated Medical–Legal Dictionary* 696 (West 1987). The TMJs connect the mandibula, or the jaw bone, with the skull. *See id.* at 431.

2. "Orthodontics" is "that branch of dentistry which deals with the development, prevention, and correction of irregularities of the teeth and malocclusion, and with associated facial abnormalities." *The Sloane–Dorland Annotated Medical–Legal Dictionary* 513 (West 1987) [hereinafter "*Sloane*"].

 A "malocclusion" is "such malposition and contact of the maxillary [(upper jaw)] and mandibular [(lower jaw)] teeth as to interfere with the highest efficiency during the excursive movements of the jaw that are essential for mastication[.]" *Id.* at 429.

3. "Orthopedic" "pertain[s] to the correction of deformities of the musculo-skeletal system[.]" *Id.* at 514.

4. "Prosthodontics" is defined as "that branch of dentistry concerned with the construction of artificial appliances designed to restore and maintain oral function by replacing missing teeth and sometimes other oral structures or parts of the face." *Id.* at 586.

5. Depending upon the context in which the term is used, "Employer" may include the employer's insurance carrier. *See* HRS § 386–1 (1985).

6. Alan Sue, D.D.S. (Sue) conducted an independent medical examination of Claimant–Appellant Mila Bocalbos (Bocalbos) on January 4, 1989. In his January 12, 1989 report, Sue stated that

## A.

The following relevant evidence is obtained from the record.

It appears that at some point prior to July 25, 1986, the date of the subject work injury, Bocalbos was apparently missing ten upper teeth and two lower teeth.[6] It is not clear whether some of the teeth were missing at different points in time. According to a January 12, 1989 report by Alan Sue, D.D.S. (Sue), Arthur Kamisugi, D.D.S. (Kamisugi) treated Bocalbos in 1974 for "lower arch[7] malocclusion" by "uprighting of [her] posterior teeth" and in 1978 Bocalbos was "placed on a retainer and active treatment was terminated." Sue indicated that Bocalbos had an upper partial denture which had replaced the missing upper teeth. Sue also reported there was no evidence of any [TMJD] between the last treatment by Kamisugi and the date of the work injury.[8] At a hearing before the Board on her claim herein, Bocalbos denied any "jaw, TMJ [or] dental problems" prior to the subject injury.

On or about July 25, 1986, Bocalbos was employed as a part-time medical technician

Bocalbos was missing teeth numbers 1, 3, 5, 6, 7, 8, 9, 10, 12, 16, 19 and 30. According to Terri McRoberts, D.D.S. (McRoberts), the average dental arch has sixteen teeth. Therefore, Bocalbos would be missing ten upper teeth (numbers 1, 3, 5, 6, 7, 8, 9, 10, 12, and 16), and two lower teeth (numbers 19 and 30). Bryce Potter, D.D.S. (Potter) stated that Bocalbos had only six upper teeth, and thus was missing ten upper teeth. However, other doctors reached different conclusions about the number of missing upper teeth. According to McRoberts, Bocalbos had six existing upper teeth and two unerupted upper wisdom teeth, for a total of eight missing upper teeth. Walter Knouse, D.D.S. (Knouse) stated that Bocalbos was missing seven upper teeth.

7. The dental arch is the "curving structure formed by the teeth in their normal position." *Sloane* at 49. The inferior dental arch is formed by the mandibular (lower) teeth, while the superior dental arch is formed by the maxillary (upper) teeth. *Id.*

8. Citing to Sue's January 12, 1989 report, Employer's motion for reconsideration to this court contends that a prior habit of bruxing caused Bocalbos's malocclusion. However, Employer omits Sue's conclusion that "[b]ruxing is not conclusive for a [temporomandibular joint disorder (TMJD)], . . . and *I cannot say with any certainty that this alone contributed or caused the [TMJD]*." (Emphasis added.)

with Kapiolani and a full-time secondary school teacher. While at work at Kapiolani, she was injured when water-soaked ceiling tiles fell on her neck and shoulder. That day, she was examined by Brian Kutsunai, M.D. (Kutsunai), an "occu-med" physician, whose diagnosis was that Bocalbos suffered cranial[9] and shoulder contusions; however, Kutsunai declared her fit to return to "regular" work "on 7/25/86," the same day as the incident.

On August 6, 1986, Bocalbos saw Thomas Walinski, M.D. (Walinski), an orthopedic surgeon. She complained of a headache and pain in her neck area and he treated her with a soft neck collar. Walinski referred Bocalbos to James Pierce, M.D. (Pierce), a neurologist, regarding the headaches. In his August 23, 1986 consultative report to Walinski, Pierce stated, "At most, [Bocalbos] could have suffered an extremely mild concussion considering the mechanism of injury which she described. These symptoms should clear rather quickly."

Bocalbos however continued to experience problems with "headaches and crunching and popping in her neck." Walinski next ordered physical therapy treatment for "probable persistent cervical strain."

On January 26, 1987, Bocalbos returned to full-time work as a teacher.

In March 1987 Walinski authorized Bocalbos for work at Kapiolani. Bocalbos briefly returned to Kapiolani, but left soon thereafter because she could not tolerate the neck pain she endured when bending over a microscope.

From August 6, 1986 through July 1987, Bocalbos saw several physicians concerning headaches and her difficulties in concentrating. After speaking with her vocational rehabilitation counselor, Julie Hernandez, Bocalbos sought treatment from Teresa Denney, O.D., an osteopathic[10] physician. She referred Bocalbos to Mr. Jeb Dishman (Dishman), an acupuncturist.[11]

Bocalbos underwent occupational therapy from May 26, 1987 to August 1987.

In a February 25, 1987 "interim report," Walinski indicated he "had no problem" with Bocalbos seeing a physiatrist.[12]

On June 8, 1987, Bocalbos began seeing Erlinda Cachola, M.D. (Cachola) for treatment.

A June 12, 1987 report by John A. Griffith, Ph.D. indicated Bocalbos was "experiencing psychological consequences and loss of function so typical of patients with Chronic Intractable Benign Pain Syndrome."

In October 1987, Cachola referred Bocalbos to the care of Emerson Jou, M.D. (Jou), a physiatrist. Jou diagnosed Bocalbos as suffering from TMJD and told her to "reduce her work or to stay off work entirely."

In January 1988, Jou referred Bocalbos to Edmund Wong, D.D.S. (Wong) for a dental evaluation, and in the same month, Jou found Bocalbos ready to resume light work at Kapiolani, subject to restrictions. However, Kapiolani refused to allow Bocalbos to return until she was able to work without any restrictions.

In August 1988, Bocalbos took a one-year leave of absence from her position with the Department of Education.

On August 15, 1988, Bocalbos was examined by Wong. Wong diagnosed Bocalbos as suffering from TMJD. According to Wong,

9. "Cranial" means "of or belonging to the skull." *Webster's Third New Int'l Dictionary* 529 (1981) [hereinafter "*Webster*"].

10. "Osteopathic" or "osteopathy" is defined as

a system of therapy ... based on the theory that the body is capable of making its own remedies against disease and other toxic conditions when it is in normal structural relationship and has favorable environmental conditions and adequate nutrition. It utilizes generally accepted physical, medicinal, and surgical methods of diagnosis and therapy, while placing chief emphasis on the importance of normal body mechanics and manipulative methods of detecting and correcting faulty structure.
*Sloane* at 517.

11. An "acupuncturist" is someone who practices acupuncture, which is defined as "the Chinese practice of piercing specific peripheral nerves with needles to relieve the discomfort associated with painful disorders, to induce surgical anesthesia, and for therapeutic purposes." *Sloane* at 9.

12. "Physiatrics" is defined as "a system of medicine based on utilization of the healing powers of nature." A "physiatrist" is a "physician who specializes in physical medicine." *Webster* at 1706.

Bocalbos's *"previous medical and dental histories" were "non-contributory," and "the accident of July 25, 1986 [was] responsible for [Bocalbos's TMJD] and ... headaches and other symptoms after the accident."* (Emphasis added.) He recommended a two-phase treatment plan. Phase one, "[p]reliminary [t]reatment," involved "treating the inflamed tissue of the temporalis and stylomandibular ligament and locating the precise condyle[13]-disc-fossa[14] relationship and maintaining the position by re-lining the patient's prosthesis (using the upper partial as an orthotic appliance)." Phase two, "permanent treatment," entailed "[o]rthodontics and [a] new upper partial ... to maintain the correct condyle-disc-fossa relationship."

Shortly thereafter, Bocalbos apparently relocated to the mainland United States and began to attend osteopathy school for what she refers to as "self-treatment." The record indicates that she returned to Hawai'i periodically.

In January 1989, while in Hawai'i, Bocalbos was seen by Sue at Employer's request, for an independent medical examination (IME). In his January 12, 1989 report, Sue stated, "My recommendation is to continue the patient on bite splint therapy to relieve as many of the acute symptoms as possible. *Orthodontic treatment may be employed to improve the relationship of the remaining teeth, after which a new dental prosthesis will be required to stabilize the occlusion*[15] *and provide the optimum function.*" (Emphases added.)

Wong had referred Bocalbos to James Roucis, D.D.S. (Roucis) for further treatment if required. On March 3, 1989, while on the mainland, Bocalbos sought assistance from Roucis to fix her "retainer." According to the bill from Roucis, he made the repair.

From October 21, 1987 until March 21, 1992, Jou continued to act as Bocalbos's primary care physician. During this time, Bocalbos also sought treatment from Alan Becker, O.D. (Becker), an osteopath.

In November 1989, David Kimura, M.D. (Kimura), an orthopedist, conducted another IME of Bocalbos at Employer's request. He examined Bocalbos on November 24, 1989, and in his December 1, 1989 report, noted that Bocalbos "denie[d] having problems with TMJ syndrome in the past." While "[s]he saw [Kamisugi] from 1973 to 1978 for ... orthodontic treatment[, s]he apparently did not have TMJ pain at that time." Kimura stated that "[a]s far as [Bocalbos's] TMJ problem is concerned, she is still undergoing treatment for this area and is not stable and stationary as far as the TMJ syndrome is concerned.... *I would recommend continued follow-up and treatment by [Wong] for her TMJ problem ....*" (Emphasis added.)

On April 5, 1991, Richard Courson, D.D.S. (Courson) performed a further independent medical examination of Bocalbos at Employer's request. In his April 11, 1991 report, he stated:

[I]f it is determined that the [TMJD] is related to the [work accident], then splint therapy and *reconstruction of the teeth would be a necessary part of [Bocalbos's] total rehabilitation. ...*

Definitive occlusal rehabilitation and reconstruction should be accomplished only after the occlusion is stable and the muscle tenderness has subsided.

(Emphasis added.)

On April 16, 1991, Becker issued a "projected treatment plan" in which he recommended "manipulative therapy to areas of dysfunction." He stated that the "goal" of the treatment plan was "to improve ROM [ (range of motion) ] of [the] back and neck, [to] correct [the] TMJ mis-alignment [and to] alleviate pain and discomfort[ ] in areas affected."

Bocalbos relocated to Philadelphia in March 1992 and began to receive treatment for her TMJD from Terry McRoberts, D.D.S. (McRoberts) on August 5, 1992. In an August 25, 1993 letter, McRoberts wrote,

---

13. "The jaw bone is called the mandible; the ball at the upper extremity of the mandible, which fits into the socket in the skull is called the condyle." *Rosario v. New York City Health & Hosps.*, 87 A.D.2d 211, 450 N.Y.S.2d 805, 806 (1st Dep't 1982).

14. "Fossa" is defined as "a trench or channel; a general term for a hollow or depressed area." *Sloane* at 298.

15. "Occlusion" is defined as "the relation of the maxillary and mandibular teeth when in functional contact during activity of the mandible." *Sloane* at 506.

"I saw [Bocalbos] in my office on 8/5/92, and she was experiencing *TMJ symptoms, balancing interferences*[16] *and Class II malocclusion*[17] due to heavy, wet ceiling tiles falling on her head and shoulders while working at [Kapiolani] on 7–25–86." (Emphasis added.) McRoberts recommended the following treatment:

I saw [Bocalbos] on 8/5/92, and began treating her for the TMJ symptoms with exercises, soft diet, and the wearing of a soft mandibular orthotic splint.

After an orthodontic work-up was completed on 8/18/92, I determined that *in order to correct [Bocalbos's] Class II malocclusion, [sic] balancing interferences, and uprighting of her molars, orthodontic treatment was the correct way to proceed in order to help her maintain a normal level of life.*

(Emphasis added.)

Bocalbos also began treatment for her cervical injuries with Walter Ehrenfeuchter, D.O. (Ehrenfeuchter), an osteopath, on September 19, 1992. Ehrenfeuchter wrote on November 18, 1992 that "[t]here is undoubtedly TMJ dysfunction present with a very restricted range of motion at the temporomandibular joint." Further, Ehrenfeuchter opined, *"Bocalbos['s] current condition is a direct result of the injuries she sustained when the ceiling fell on her."* (Emphasis added.)

On September 26, 1992, Bocalbos was also seen by Walter Knouse, D.D.S. (Knouse), a prosthodontist, who was recommended to her by McRoberts. In a November 2, 1992 letter to Employer's attorneys, Knouse explained:

[Bocalbos] is presently experiencing many dysfunctional symptoms and pain due to her crainiomandibular [sic] misfunction. It is difficult for us to present an exact treatment plan, as *she needs to have much*

*orthodontic and orthognathic*[18] *treatment done first.* She is missing *54321 12,*[19] which make[s] this case very difficult and also very extensive.

. . . .

[I]t is difficult to determine the exact cost and length of treatment, since it mainly depends on the orthodontic and orthognathic results, and the implantology results. *This combined treatment is most definitely necessary to stabilize the crainiomandibular [sic] dysfunction. . . .*

(Some emphases added.)

According to Knouse's report dated November 3, 1992, prosthodontic treatment consists of surgical implants and prosthetic treatment. First, the report indicated implants would need to be surgically placed, which might require bone removal, spreading, and augmentation. After the surgical procedures, prosthetic treatment consisting of dental bridgework would commence.

On December 8, 1992, Bryce Potter, DMD/MD (Potter) completed still another IME report requested by Employer. In this report, Potter opined:

It seems highly unlikely that [Bocalbos] would benefit from any type of orthodontic therapy when she has only six teeth remaining in the upper arch. She could, however, very easily undergo a comprehensive reconstruction of the teeth without ever going through orthodontic therapy. *I qualify this by stating I have not looked at [Bocalbos's] x-rays and have not examined her.*

(Emphasis added.)

McRoberts's fee schedule indicated that on May 11, 1993, he treated Bocalbos through the "[i]nstall[ation of an] *orthopedic* appliance" which he described as a "Complex modified Crozat with temporary partial for

---

16. In dentistry, "interference" means "any premature contact point along the occlusal surface of the teeth that prevents maximum contact, function, and proper alignment in full occlusion." *Dorland's Illustrated Medical Dictionary* 672 (26th ed.1981) [hereinafter *"Dorland"*].

17. A "Class II malocclusion," or "Distoclusion" occurs when "[t]he lower dental arch is posterior to the upper in one or both lateral segments; the lower first molar distal to the upper first molar." *Sloane* at 430. "Distal" means "remote; farther

from any point of reference[,]" *id.* at 222, and "posterior" means "situated in back of, or in the back part of[,]" *Id.* at 571.

18. "Orthognatics" is "the science dealing with the cause and treatment of malposition of the bone of the jaw." *Dorland* at 936.

19. These numbers refer to the location of the places in Bocalbos's mouth from which teeth were missing.

upper teeth." (Emphasis added.) As defined in the record, a "Crozat" is a removable orthodontic appliance, usually made of a precious metal, used to align teeth during orthodontic therapy." [20]

On September 13, 1993, McRoberts made a note with respect to "Questions," in which he stated that Bocalbos was "currently under *orthodontic treatment for cranio-mandibular problems (including TMJ dysfunction)* resulting from the accident when the ceiling tile collapsed on her head, neck, and shoulders." (Emphasis added.) According to McRoberts, treatment required a "multiple modality approach" which included "dental work"

> *to restore as much of the proper functions of the neck and cranio-mandibular areas* and at the same time alleviate the numerous discomforts that result from such dysfunctions such as severe headaches, eye pain, difficulty swallowing, neck and shoulder pains, chronic fatigue, insomnia, and other symptoms mentioned in prior reports.

> *The standard of care currently advocated by those claiming to be specialists in TMJ problems include a multiple modality approach such as dental work,* physical therapy, psychological support, and medications for pain, anxiety, depression.... *It appears that [Bocalbos] responds best to orthodontic correction with concurrent osteopathic manipulation.*

(Emphases added.)

### B.

The following decisions and orders are relevant.

**20.** In arguing at the hearing on Bocalbos's motion for reconsideration or clarification of the Board's Amended Decision and Order on February 20, 1997, Bocalbos's attorney explained, "Crozat is simply a different way of doing braces.... Instead of putting the braces in front ... they do it underneath and behind, where you can't see it, and they do it orthopedically."

In its reconsideration motion, Employer argues McRoberts's treatment, including the crozat appliance, was directed at Bocalbos's upper arch and, therefore, her missing teeth. Employer contends that the missing teeth were pre-existing and, therefore, unrelated to Bocalbos's TMJD.

On January 5, 1989, the Director of the Department of Labor and Industrial Relations (the Director) held a hearing to determine disability benefits that should be awarded to Bocalbos. In a February 22, 1989 decision, the Director found that Bocalbos was authorized to receive temporary total disability benefits, and that her "TMJ condition is related to the injury of July 25, 1986[.]" The Director also concluded that Bocalbos "suffered aggravation of her psychological condition as a result of the injury of July 25, 1986[.]" Bocalbos was awarded temporary total disability benefits [21] and, *inter alia*, Employer was held responsible for Bocalbos's TMJ treatment for certain periods from August 10, 1986 through August 27, 1987, the date on which Cachola released Bocalbos to resume work to Kapiolani under Cachola's supervision.

On September 21, 1992, the Director issued a supplemental decision and order denying temporary total disability benefits after August 27, 1987, finding that "if [Bocalbos] can continue her education [at osteopathy school] then she is capable of working at her customary employment." Further, the Director concluded that Employer was not responsible for covering treatment provided by Roucis. [22] On October 12, 1992, Bocalbos appealed this decision to the Board.

On December 23, 1992, Bocalbos requested that the Board remand her claim to the Director to address her entitlement to treatment from McRoberts and Ehrenfeuchter. The remand request was granted on January 8, 1993.

However, McRoberts concluded that the malocclusion was caused by the falling ceiling tile, and orthodontics was the "correct way to proceed" in treating this malocclusion.

**21.** Kapiolani was to pay Bocalbos "weekly compensation of $299.00 for temporary total disability from work beginning August 10, 1986 through March 22, 1987; April 19, 1987 through May 17, 1987; and May 20, 1987 through August 27, 1987[.]"

**22.** The order also denied benefits for treatment from Teresa Denney, D.O., Mr. Jeb Dishman, and Ronald Carlson, D.D.S. (Carlson).

On December 21, 1993, the Director issued a supplemental order stating that Bocalbos was entitled to treatment from Ehrenfeuchter and McRoberts. The December 21, 1993 supplemental order did not state the specific type of treatment for which Employer would be liable. However, the order stated that "employer shall pay for such medical care, services and supplies *as the nature of the injury may require to include the treatment of [McRoberts] and [Walter Ehrenfeuchter, D.O.].*" (Emphasis added.)

On January 10, 1994, Employer appealed to the Board from this decision. On the same date, Employer also filed a motion for stay of payments. The stay was granted on January 24, 1994.

On April 3, 1995, trial was held.

On August 28, 1996, the Board issued a "Decision and Order." This decision denied temporary total disability benefits on or after August 28, 1987, the date on which Employer terminated paying temporary total disability benefits to Bocalbos because she was released to return to work at Kapiolani. Compensation for medical services provided by Roucis was also denied. However, the Board concluded that *"the Director properly found that Bocalbos was entitled to medical care by Drs. McRoberts and Ehrenfeuchter"* (emphasis added) and approved their treatment and Becker's April 16, 1991 treatment plan.

On September 10, 1996, Employer requested that the Board reconsider its decision awarding medical treatment by Ehrenfeuchter and McRoberts. It contended that McRoberts never explained the specific orthodontic procedures he planned to utilize, and urged clarification of the Board's award.

On December 17, 1996, the Board issued an "Amended Order and Decision." The Board amended its prior decision by adding a conclusion 6 which stated, in pertinent part, that Employer was "liable for treatment of [Bocalbos's] TMJ dysfunction only ... and [was] not liable for treatment of pre-existing missing teeth and malocclusion." According to the Board, Employer was required to provide only compensation for treatment by McRoberts involving "exercise, soft diet, and a soft mandibular orthotic splint[,]" and was not responsible for "orthodontic and orthopedic treatment and ... prosthodontics[,]" as recommended by McRoberts. The Board again confirmed Employer was liable for Ehrenfeuchter's treatment.

On January 16, 1997, Bocalbos filed a motion for reconsideration of the Board's amended order and decision. On March 14, 1997, the Board issued its "Second Amended Order and Decision." In the preamble to the findings and conclusions, the Board reiterated that Employer was not liable for treatment provided by Roucis, or for "the proposed orthodontic and orthopedic treatment or the recommended prosthodontic treatment."

On April 14, 1997, Bocalbos filed a motion to reopen the case to take further evidence in connection with the Board's second amended order and decision. On April 23, 1997, the Board entered its denial of her motion without any explanation.

Her appeal to the appellate courts followed.

## II.

■ Judicial review of administrative agency decisions, in particular the decisions of the Board, is governed by HRS § 91–14 (1993).[23] *Bumanglag v. Oahu Sugar Co.,* 78

---

23. HRS § 91–14(g) states:

(g) Upon review of the record the court may affirm the decision of the agency or *remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:*

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) *Affected by other error of law; or*

(5) *Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or*

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

(Emphases added.)

HRS §§ 91–14 and 386–88 (Supp.1979) are both applicable to an appeal of decisions and orders issued by the Board. Case law has determined that HRS § 386–88 supersedes HRS § 91–14 only with respect to the statement that the judicial review be instituted with the circuit court. For instance, in *Ras v. Hasegawa,* 53

Hawai'i 275, 279, 892 P.2d 468, 472 (1995); *Diaz v. Oahu Sugar Co.*, 77 Hawai'i 152, 154, 883 P.2d 73, 75 (1994); *Tate v. GTE Hawaiian Tel. Co.*, 77 Hawai'i 100, 102, 881 P.2d 1246, 1248 (1994). *See Sussel v. Civil Serv. Comm'n*, 74 Haw. 599, 608–09, 851 P.2d 311, 316–17, *reconsideration denied*, 74 Haw. 650, 857 P.2d 600 (1993). Under HRS chapter 91, *appeals taken from findings set forth in decisions of the [b]oard are reviewed under the "clearly erroneous" standard. . . .* Thus, this court considers whether such a finding is "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record[.]" *Tate*, 77 Hawai'i at 102, 881 P.2d at 1248 (quoting *Chung v. Animal Clinic, Inc.*, 63 Haw. 642, 651, 636 P.2d 721, 727 (1981)) (some brackets in original; footnote omitted; emphasis added).

■■■■ "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, 'the appellate court is left with the definite and firm conviction that a mistake has been made.'" *Hirono v. Peabody*, 81 Hawai'i 230, 232, 915 P.2d 704, 706 (1996). On the other hand, "[a] conclusion of law . . . is not bind-

ing on an appellate court and is freely reviewable for its correctness." *State v. Furutani*, 76 Hawai'i 172, 180, 873 P.2d 51, 59 (internal quotation marks and citation omitted). Thus, this court reviews [conclusions] *de novo* under the right/wrong standard." *Tate*, 77 Hawai'i at 103, 881 P.2d at 1249 (citations omitted).

The supreme court has defined "substantial evidence" as "relevant and credible evidence of a quality and quantity to justify a reasonable [person] to reach a conclusion." *Acoustic, Insulation & Drywall, Inc. v. Labor and Indus. Relations Appeal Bd.*, 51 Haw. 312, 316, 459 P.2d 541, 544 (1969).

### III.

■■■ Bocalbos appears *pro se* and her points are somewhat imprecise. However, we discern from her briefs that she "seek[s] reversal of the [Board's] order regarding [her] medical care[,]" and more specifically, "that [she be] award[ed] the orthodontic and prosthodontic treatment [she] need[s] to recover from the compensable [TMJD] injury." [24] We address two of the errors she claims were made by the Board in its March 14, 1997 decision [25] and order. That decision

Haw. 640, 500 P.2d 746 (1972), the claimant "filed [an] action in the circuit court seeking a preliminary injunction barring the enforcement of [the Board] director's order[.]" *Id.* at 640, 500 P.2d at 747. The circuit court dismissed the action on the ground that it lacked jurisdiction and the claimant thereafter appealed. *Id.* at 641, 500 P.2d at 747. The Hawai'i Supreme Court affirmed the dismissal, holding that "[a]lthough the Department of Labor and Industrial Relations . . . is an 'agency' within the meaning of HRS § 91–14, . . . HRS § 386–88 supersedes HRS § 91–14 and removes the circuit court from the appellate process with regard to the proceedings brought under HRS ch. 386". *Id.*

In *DeVictoria v. H & K Contractors*, 56 Haw. 552, 545 P.2d 692 (1976), the supreme court confirmed HRS § 91–14(b) provides that "proceedings for review shall be instituted in the circuit court . . . *except where a statute provides for a direct appeal to the supreme court.*" *DeVictoria*, 56 Haw. at 556 n. 3, 545 P.2d at 697, n. 3 (emphasis added). Therefore, under *Ras* and *DeVictoria*, HRS chapter 91 applies except with respect to the circuit court provision.

Thus, HRS § 91–14 concerning the standard of review on appeal governs in the present case. *See Ostrowski v. Wasa Elec. Servs., Inc.*, 87 Hawai'i 492, 495, 960 P.2d 162, 165 (App.1998) (holding that "appellate review of [the Board's] decision is governed by HRS § 91–14"); *Williams v. Kleenco*, 2 Haw.App. 219, 219, 629

P.2d 125, 126 (1981) (stating that "[a]ppeals from [the Board] are allowed under [HRS § ] 386–88 . . . [h]owever, they are governed by the provisions of the Hawai'i Administrative Procedures Act and particularly by [HRS § ] 91–14").

24. Carlson recommended Bocalbos's metal fillings in her teeth be replaced with composite fillings prior to orthodontic treatment. The Board found that such treatment was not necessitated by her work injury. According to an April 10, 1997 letter from Edmund Wong, D.D.S. (Wong) to the Board, Bocalbos manifested "high galvanic activity" and "reactivity" to some of the metals in the fillings." Because of this sensitivity, removal of the metal fillings was "a needed preparatory step prior to orthodontics." In any event, her metallic fillings were removed at Bocalbos's expense and we do not view her appeal as requesting payment for such treatment.

25. Bocalbos challenges several findings and conclusions from the December 17, 1996 amended decision and order; however, that decision and order was subsequently modified in the second amended decision and order of March 14, 1997.

In addition to apportioning medical benefits, the March 14, 1997 order also ruled that Bocalbos was not entitled to temporary total disability benefits after August 28, 1987 and to full travel reimbursement. However, from Bocalbos's opening and reply briefs, we can find no discer-

contains the most recent findings and conclusions denying Bocalbos orthodontic, orthopedic, and prosthodontic treatments.

## IV.

As a preliminary matter, we examine Bocalbos's objections to finding 17 and conclusion 3 which determined that the retainer repaired by Roucis was not an appliance fabricated by Wong for her TMJD.

## A.

Bocalbos maintains that finding 17 "led the [Board] to infer that [she] had a medical diagnosis of pre-existing malocclusion." Finding 17 states:

> 17. [Bocalbos] also saw [Roucis], a dentist in Colorado, on March 3, 1989, to repair a retainer.

> Following orthodontic treatment in 1978, [Bocalbos] had been placed on a retainer by [Kamisugi]. According to [Bocalbos], she wore this retainer for less than a year.

> *[Bocalbos] contends that [Wong] fashioned a lower arch retainer in 1988, to complement her upper splint so as to prevent her jaw from dropping at night and thereby prevent aggravation of her [TMJD] symptoms. [Bocalbos] contends that it was this retainer and not the retainer from [Kamisugi], that [Roucis] repaired. We are unable to find, however, a specific reference in the record to confirm [Bocalbos's] contention that [Wong] provided her with a retainer in 1988, as part of his treatment of her [TMJD].*

(Emphases added.) Part of conclusion 3, related to finding 17, states:

> [W]e have found no evidence in the record on appeal to corroborate [Bocalbos's] contention *that the retainer prepared by [Roucis] was a retainer from [Wong] for her TMJ dysfunction.*

(Emphasis added.)

nible argument on these latter issues. The failure to provide a discernible argument violates Hawai'i Rules of Appellate Procedure Rule 28(b)(7), which provides, in part, that an opening brief shall include "[t]he argument, exhibiting clearly the points of fact and of law being presented, citing the authorities relied upon." An appellate court need not address matters as to

On appeal, Bocalbos argues that she "saw [Roucis] for the repair of a 'retainer.' However, that appliance is not the same retainer that [Kamisugi] told [Sue] he provided in 1978 after active lower arch orthodontic treatment was completed to upright a leaning molar." Employer argues that

> [i]n the 1970[sic], [Kamisugi] fitted [Bocalbos] with a retainer for her lower arch.... In March 1989, [Roucis] repaired [Bocalbos's] retainer.... The [Board] therefore correctly concluded that [Roucis] could only have repaired [Bocalbos's] retainer for her lower arch, a preexisting condition. No other retainer, other than one fitted by [Kamisugi], was referenced in the records.

## B.

We observe that there was evidence in the record supporting the contention that Roucis repaired the orthosis fabricated by Wong. At the April 3, 1995 hearing before the Board, Bocalbos testified the appliance repaired by Roucis was from Wong:

> Q. And finally, you went to see [Roucis]?

> A. Uh-huh.

> Q. What was the—what were the circumstances around the visit? [Roucis] . . . [h]e's a dentist?

> A. He's a dentist.

> Q. Okay.

> A. I guess he's like [Wong], an orthodontist because he said—I got his name from [Wong who] said, since you have a splint on that you have to keep for a year or two, and you're on disability, . . . go and stay on the mainland [and] if you have any trouble, go and see [Roucis], *because he kind of knows my technique[. H]e studied a little bit under me. . . . [T]hat's how I got [a]hold of [Roucis.] So I was instructed by [Wong] to see [Roucis] if the retainer he made had any problems. And it broke, so I did.*

which the appellant has failed to present discernible argument. *See Child Support Enforcement Agency, State of Hawai'i v. Doe,* 88 Hawai'i 159, 174 n. 20, 963 P.2d 1135, 1155 n. 20 (App.1998). Accordingly, we limit our analysis to the Board's rejection of the medical benefits requested by Bocalbos.

. . . .

Q. And so, in that—you were living on the mainland, and *you went to see [Roucis]?*

A. *And that retainer was [a] night retainer to prevent my jaw from . . . collapsing.*

(Emphases added.) Wong's referral of Bocalbos to Roucis for repair of "the retainer he [ (Wong) ] had made" was explained by Roucis's familiarity with Wong's "technique." There is no other explanation in the record for the referral to Roucis. Employer did not offer any direct evidence to show that the retainer about which Bocalbos testified was the one she used in 1978, as opposed to the appliance provided her by Wong in 1988. Bocalbos's testimony thus was unrebutted.[26]

### C.

Any confirmation or corroboration sought by the Board was provided by Bocalbos's motion to reopen the case. In her April 14, 1997 motion to reopen the case, Bocalbos pointed out that "there was never any focus or argument that in fact Wong did *not* fabricate some sort of device." She therefore requested that written statements from Wong and Roucis concerning the "retainer" be considered by the Board. In his statement, Wong wrote:

> I fabricated a lower arch orthosis for [Bocalbos] in 1988 before she went to Colorado because she was having problems with the jaw dropping when she laid down. *It is this same appliance that [Roucis] had to do an emergency repair and which he called a "retainer."*

(Emphases added.) In corroboration, Roucis explained that he

> saw [Bocalbos] in [his] office on March 3, 1989 as an emergency pat[ient]. She was *referred there by [Wong], a colleague of mine in the treatment of TMJ disorder. A repair was made to the lower arch or-*

thosis which [Bocalbos] wore at night. This repair was incorrectly referred to as a retainer on the superbill dated 3/3/89.

(Emphasis added.) The Board denied Bocalbos's motion to reopen on April 23, 1997.

### D.

■ HRS § 386–87(d) (1985) provides in pertinent part that "the [Board] may upon application of . . . any . . . party . . . reopen the matter and thereupon may take further evidence or may modify its findings, conclusions or decisions." By use of the term "may," HRS § 386–87(d) vests the Board with discretion to reopen the case. "It has been consistently held that rehearings before administrative bodies are addressed to their own discretion, and 'only a showing of the clearest abuse of discretion could sustain an exception to that rule.'" *In re Kauai Elec. Div. of Citizens Utils. Co.*, 60 Haw. 166, 195, 590 P.2d 524, 543 (1978) (quoting *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946)) (citations omitted). An abuse of discretion occurs when a reviewing body "exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 241, 948 P.2d 1055, 1082 (1997) (internal quotation marks and citations omitted). Thus, we review the Board's denial of Bocalbos's motion for abuse of discretion.

■ The Board gave no reasons for its denial of Bocalbos's motion. There is no cogent explanation for the Board's failure to consider Wong's and Roucis's letters or McRoberts's report in light of their direct effect on the correctness of the Board's finding and conclusion.

In the course of this case, the Board issued three decisions. The August 28, 1996 Decision and Order adopted the Director's decision approving McRoberts's treatment "as the nature of the injury may require." The

---

26. There are what appear to be other references in the record to an orthotic appliance fashioned by Wong. The December 1, 1989 report of David Kimura, M.D. states that "[Wong] noted on August 24, 1988 that the patient had been made a dental orthosis," and "[Bocalbos] was using a dental orthosis which was prescribed by [Wong]." In a letter from Wong to Employer dated August 8, 1990, Wong said that Bocalbos

"is currently wearing an orthotic appliance . . . [and] that the orthotic appliance will need adjustments periodically[.]" In a letter dated September 11, 1990 from Employer's attorneys to Emerson Jou, M.D., the attorneys referred to Bocalbos's relief "when she removes the orthotic appliance." Finally, in a December 10, 1990 letter, Wong referred to a malocclusion following repositioning by way of "the orthotic appliance."

amended Decision and Order partially reversed the first decision by restricting McRoberts's treatment plan. The third, designated as a second amended order, essentially reiterated the amended order. The change in the Board's focus of the evidence is reflected in its decisions. Under these circumstances, we conclude there was no rational basis for refusing to consider the evidence submitted by Bocalbos. The further evidence as stated by Bocalbos sought to clarify *inter alia* the following issues:

[1]. The question of the relationship and tying in of the malocclusion and the TMJ condition ... [and]

[2]. The issue as to whether the requested orthodontic and prosthodontic work on the missing teeth related only to an unrelated pre-existing problem, ... or is caused by her industrial accident.

These issues related to the Board's revised decision to limit Bocalbos's medical entitlement. In our view, the equities of the case required the Board to allow Bocalbos the opportunity to present evidence rebutting the Board's reversal of its own compensation decision. In the absence of any reasonable articulation for its refusal, we believe that the Board abused its discretion in denying the motion.[27]

## V.

Notwithstanding finding 17 and conclusion 3, we posit that disposition of this case rests on Bocalbos's challenges to finding 34 and conclusion 6. Finding 34 determined that McRoberts's recommended orthodontic, orthopedic, and prosthodontic treatments were not related to Bocalbos's TMJD. Finding 34 states:

34. *As to the orthodontic and orthopedic treatment and prosthodontic treatment recommended by [McRoberts], [Bocalbos] alleges that such treatment is related to her [TMJD].*

In a report dated August 25, 1993, [McRoberts] opined that orthodontic treatment was necessary to correct a Class II malocclusion and balancing interferences, which [McRoberts] attributed to the July 25, 1986 work injury. *[McRoberts] did not, however, clearly explain how the Class II malocclusion and balancing interferences which allegedly resulted from the work injury were related to [Bocalbos's TMJD]. Accordingly, we find that the orthodontic and orthopedic treatment is not related to [Bocalbos's TMJD].*

It appears that the prosthodontic treatment is needed to replace [Bocalbos's] missing teeth. [Bocalbos] was missing teeth before her July 25, 1986 work injury. Accordingly, *we find that the prosthodontic treatment is related to a pre-existing dental condition.*

(Emphases added.)

Relevant to this finding was the Board's conclusion 6, which stated, in pertinent part:

6. With the exception of the extent of [McRoberts's] treatment, we conclude that the Director did not err in awarding [Bocalbos] medical care by [McRoberts] and [Ehrenfeuchter], subject to compliance with the [Medical Fee Schedule of the Hawaiʻi Administrative Rules]. While [McRoberts] proposed various types of treatment, Employer's liability is limited to treatment related to [Bocalbos's] TMJ dysfunction. *We determined that only a portion of [McRoberts's] treatment was related to [Bocalbos's TMJD].* Accordingly, we conclude that Employer is liable for treatment of [Bocalbos] with exercises, soft diet, and soft mandibular orthotic splint, *but not for the orthodontic and orthopedic treatment and prosthodontics.*

We further conclude the Employer is liable for the treatment of [Bocalbos's] neck by [Ehrenfeuchter], because we have found based on the evidence before us that the neck symptoms for which [Bocalbos] was treated by [Ehrenfeuchter] are related to her work injury.

(Emphases added.)

---

**27.** In its reconsideration motion to this court, Employer contends that the medical reports submitted with Bocalbos's April 14, 1997 request for reopening violated the medical report submission deadline for the Board's hearing and/or constituted new evidence. Neither argument is relevant to Bocalbos's request to the Board to take *"further evidence* or [to] modify its findings, conclusions or decisions"* as allowed by HRS § 386-87(d) (1985). (Emphasis added.)

## A.

Initially, we observe that as part of her April 14, 1997 motion to reopen the case, Bocalbos offered a letter by McRoberts in which he responded to the Board's ruling that he had not "clearly explain[ed]" how the malocclusion was related to the TMJD and rebutted the finding "that the prosthodontic treatment was related to a pre-existing dental condition." We believe it necessary to quote from his letter at length:

(f) The average dental arch has 16 teeth if the third molars (wisdom teeth) erupt. [Bocalbos's] maxillae (upper arch) has 6 teeth plus 2 unerupted third molars. She has no quadrant that is missing all the posterior molars *and her missing teeth have always been adequately replaced. Therefore, adequate posterior and total arch support was in place at the time of the accident. Her bite must have been adequate prior to the accident as her upper partial remained unchanged since she first wore the prosthesis.* In addition, [Bocalbos] had no [craniomandibular disorder (CMD)]-[temporomandibular disorder (TMD)] symptoms prior to the work accident as reported by her long-time general dentist Dr. Hugh Matsumura [(Matsumura)]. *She was functioning normally and was able to chew, swallow, and speak without any difficulty.* Furthermore, as already noted in the records, *she had never experienced such debilitating pain and other discomforts* that caused loss of earnings for such an extended period of time.

(g) *When [Wong] initially examined Bocalbos, he found her condyles to be displaced and in that position there was a class II malocclusion.* He, therefore, repositioned [Bocalbos's] jaw to the correct condyle-disc-fossa relationship by pulling the mandible forward and laterally, and then converting [Bocalbos's] upper partial into a splint using acrylic or a similar compound ([Bocalbos] provided this information to me).... *He further noted that the malocclusion perpetuated and aggra-*

*vated the pains of the head, neck and shoulder.*

....

(i) ... [I]f the roots of the teeth are not in the proper alignment, putting a splint over the teeth will cause more misalignment tantamount to paving a road without proper foundation....

*Orthodontics is necessary in Bocalbos's case because good occlusal stabilization will provide the most support for the TMJ complexs'* [sic] *functioning* since other support structures, like muscles, tendons, and ligaments in the area of the TM joint have been damaged extensively, thus making the joint very unstable and subject to frequent exacerbations of dysfunction. *Orthodontics involves realigning the teeth so the permanent occlusal work through prosthodontics could [sic] be done. ...*

....

(k) ... *Briefly, the missing teeth did not cause TMD but rather made treatment more complicated and limited the choice of appliance.*

....

*Any comprehensive treatment for CMD–TMD must addres [sic] three key areas of the body: the muscles of mastication and the neck, the TMJs and accessory structures, and the occlusion. As long as these three areas are not stable, symptoms attributable to the disease/dysfunctional state will persist and the condition may result in some loss of function. ...*

....

The [TMJ] consists of the mandibular condyle, the disc, the capsule, and the synovial lining. The joint has a complex motion and any disruption in its position can lead to symptoms of CMD–TMD. Bocalbos's TMJs have obviously been disrupted....

The mandible (jaw bone) is involved in the opening and closing of the mouth and allows us to chew and grind food. *The teeth embedded in the mandible have to have optimum occlusal contact with the teeth of the upper arch in order to function properly and also to help maintain the condyle-disc-fossa relationship. In Bocal-*

bos's case her bite was changed as a result of the accident. Since the problem was not addressed immediately and the soft tissues were affected, a chronic state of irritation probably persisted....

The ultimate goal of correcting the malocclusion is to treat the TMD. There are two key steps: *orthodontics to place the teeth in proper alignment and then prosthodontics to provide a permanent and stable occlusion that will support the proper condyle-disc-fossa relationship and reduce or eliminate the muscle spasms that perpetrate a cycle of dysfunction.* A stable occlusion is critical in Bocalbos's case because the other support structures in the area of the joint and the tendons, ligaments, and muscles that connect the mandible and other bony parts of the head, face, and neck have been strained and weakened. Ligaments and tendons are inelastic but flexible and do not heal well especially if stretched beyond the limits of their function. *The occlusion affects the condylar position because it is one endpoint during the movement of the mandible.*

. . . .

*With regard to prosthodontics, implants have been proposed by [Knouse] because they are stationary and will provide good anchorage for re-building the appropriate occlusal pattern.* He proposed a fixed bridge so the occlusion will be stable and not subject to periodic adjustments. Implants will provide some of the posts for a fixed bridge....

(Emphases added.)

We believe the failure of the Board to consider McRoberts's letter was also an abuse of discretion for the same reasons previously discussed in Part IV.D., *supra.*

### B.

In its motion for reconsideration to this court, Employer maintained that documents submitted with Bocalbos's April 14, 1997 motion to reopen should not be considered by us. As indicated in our original decision, while we believed the Board abused its discretion in failing to consider the fur-

ther medical reports submitted by Bocalbos, the record, without consideration of such reports, in any event supports Bocalbos's claim. We conclude the Board erred in rendering finding 34 and conclusion 6 because there was ample substantial evidence in the record that the orthodontic, orthopedic, and prosthodontic treatments were necessary, in view of the nature of Bocalbos's injury.

As a starting point, we consider it undisputed that Bocalbos's TMJD was a compensable work-related injury, none of the parties contesting finding 2, which stated that "Claimant sustained compensable head, neck, and shoulder injuries as well as [TMJ] dysfunction and aggravation of her psychological condition on July 25, 1986, after she was struck by a falling section of soggy ceiling material."

In that regard, HRS § 386–3 (1985) provides, *inter alia,* that "[i]f an employee suffers personal injury ... by [an] accident arising out of and in the course of employment[,] ... the employee's employer ... shall pay compensation[.]" (By virtue of HRS § 386–1 (1985), the insurer of an employer is also subject to the employer's liabilities.) Since Bocalbos sustained a work related injury, Employer was required to pay "compensation" for that injury as compensation is described under various provisions of HRS chapter 386.

As part of the compensation owed the employee, HRS § 386–21 provides that the employer "shall ... so long as reasonably needed ... furnish to the employee *all* medical care, services, and supplies *as the nature of the injury requires.*" (Emphases added.) In addition, HRS § 386–24 (1985) mandates that the "medical services and supplies to which an employee suffering a work injury is entitled shall include *such services, aids, appliances, apparatus, and supplies as are reasonably needed for the employee's greatest possible medical rehabilitation.*" (Emphasis added.)

### C.

As indicated previously, Bocalbos testified that she had not experienced any related problems prior to the accident:

Q.... Prior to this injury, *had you ever had any prior jaw, TMJ, dental problems?*

A. *No.*

....

Q. Okay. *Have you ever been diagnosed with malocclusion prior to the injury?*

A. *No.* Oh, I had one lower molar uprighted by Kamisugi back in the seventies. But if you recall in the report of [Sue], he talked to Kamisugi twice, and [Kamisugi] clarified that.

(Emphases added.) A letter dated July 17, 1992 from Matsumura, attached to Bocalbos's opposition memorandum to Employer's September 10, 1996 motion for reconsideration, stated, "[Bocalbos], who has been seen by me for dental treatment since 2/27/70, has had no TMJ problems since then to the time of the accident." As already mentioned, Wong reported that "previous medical and dental histories" of Bocalbos were "noncontributory," and "the accident of July 25, 1986[was] responsible for [Bocalbos's TMJD.]" Wong recommended a two-phased treatment plan, "phase II" being permanent "orthodontics" to maintain Bocalbos's correct jaw bone relationship.

Sue, Employer's own IME expert, in apparent agreement with Wong, indicated that "orthodontic treatment may be employed" and that "a new dental prosthesis will be required to stabilize the occlusion." Kimura, another of Employer's IME experts, recommended "continued follow up and treatment by [Wong]." Courson, still another Employer IME expert, opined that "reconstruction of the teeth would be a necessary part of ... [Bocalbos's] rehabilitation."

McRoberts wrote that the TMJD, balancing interferences, and the Class II malocclusion were "due" to the accident, and that the "cranio-mandibular problems (including the TMJ dysfunction)" were the result of the accident. He indicated, as had Wong, Sue, and Kimura, that orthodontic treatment was required. Knouse stated that orthodontic and orthognathic treatment must be done "first" and the "*combined treatment was* ... necessary to stabilize" the TMJ. (Emphasis added.) Knouse indicated prosthodontic treatment involved implants and bridgework.

McRoberts installed an orthopedic appliance called a Crozat in conjunction with his orthodontic treatment. Finally, McRoberts related that "the standard of care correctly advocated by ... specialists in TMJ problems include a multiple modality approach, such as dental work, [etc.]" Although Potter, a fourth Employer IME expert, did not agree with orthodontic treatment, he recommended "reconstruction" of her upper and lower teeth.

In our view, the Board's findings contained no substantial evidence rebutting Bocalbos's claim that treatment was related to the TMJD. Potter's report was the only medical opinion on which the Board appeared to rely. In its second amended decision and order, the Board stated that "[Potter] ... indicated ... it was highly unlikely that [Bocalbos] would benefit from any type of orthodontic treatment when she only had six teeth remaining in the upper arch." However, as the Board admitted, "*[Potter] did not render an opinion as to whether such treatment was related to [Bocalbos's] work injury.*" Finding 32 (emphasis added). Moreover, as stated previously, Potter himself gave only a qualified opinion, stating, "I qualify this by stating I have not looked at [Bocalbos's] x-rays and have not examined her." In light of the qualifications placed on his opinion, we conclude Potter's report did not constitute substantial evidence supporting a denial of Bocalbos's claim.

Based on the foregoing, we believe there was substantial evidence that the nature of Bocalbos's injury, i.e., her TMJD, required the recommended combined orthodontic, orthopedic,[28] and prosthodontic treatment. We

---

28. As for the orthopedic care recommended by McRoberts, the Board did not make any specific findings concerning this treatment and there is no evidence that such treatment was for anything other than the TMJD. Bocalbos does not specifically refer to such treatment in her briefs.

Substantial evidence in the record supports the necessity for dental orthopedic treatment. The record indicates that McRoberts installed an *or-thopedic* appliance called a Crozat. In the context of this case, the reference to orthopedic treatment apparently refers to this installation. Orthodontics is a subfield of orthopedics. "Orthopedics" is "that branch of surgery which is specially concerned with the preservation and restoration of the function of the skeletal system, its articulations and associated structures," *Dor-*

conclude (1) the record lacks substantial evidence to support the Board's finding that orthodontic, orthopedic, and prosthodontic treatments were not related to Bocalbos's TMJD and (2) assuming *arguendo* there is any evidence which could conceivably be construed otherwise, we are left "with a firm and definite conviction that a mistake [was] made" by the Board in determining that such treatment was not required by Bocalbos's TMJD.

### D.

 Because conclusion 6 rested on what we determine to be erroneous findings, we regard that conclusion as wrong with respect to the claimed treatment. We conclude denial of the recommended treatment was clearly erroneous and wrong under the standard set forth in HRS § 91–14(g)(4) and (5) and the Board's amended decision and order must be vacated on that basis.[29]

### VI.

### A.

 We observe, further, that there was no evidence that prior to the accident Bocal-

bos experienced symptoms of the type she complains of now. Bocalbos had had dental treatment and appliances prescribed for her. Whatever dental condition existed prior to the accident was not symptomatic.[30] Granted that Bocalbos was missing some of her teeth before July 25, 1986, there is no support in the record for the conclusion that this pre-existing condition caused Bocalbos any disabling problems prior to her injury.[31] Knouse stated that her missing teeth ultimately made treatment "very difficult." It seems that the TMJD, indisputably caused by the work-related accident, simply required more complex treatment in this case because of Bocalbos's pre-accident status.

Nevertheless, the Board sought to apportion medical treatment coverage afforded by HRS § 386–21 between a "pre-existing" dental condition and the accident-induced TMJD upon the unstated assumption that treatment for Bocalbos's injury could be so divided. We note that there is no statutory authority granted to the Board to apportion medical

---

*land* at 937, and "dental orthopedics" or orthodontics is "the correction of malformations of the face and jaws." *Id.*
 We conclude, therefore, that the Board was incorrect in determining in conclusion 6 that Bocalbos was not entitled to such orthopedic treatment.

**29.** In its motion for reconsideration to this court, Employer argues that this court failed to provide presumptive validity to the Board's decision. Obviously, there are exceptions to the presumption of validity. HRS § 91–14(g) expressly recognizes that we may

> reverse or modify the [Board's] decision and order if the substantial rights ... have been prejudiced because the administrative findings, conclusions, decisions, or orders are: ...
> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record[,]

as we have determined. Further, we disagree that under the circumstances, it was demonstrated by the record that the Board "carefully reviewed all the available medical evidence in reaching its conclusions" since the Board refused to consider further relevant evidence submitted by Bocalbos in her motion for reopening.
 Finally, a presumption of validity is not accorded an administrative body acting within its sphere of expertise if the decision is "unjust and unreasonable in its consequences." *In re Appli-*

*cation of Hawaii Elec. Light Co.*, 60 Haw. 625, 629, 594 P.2d 612, 617 (1979).

**30.** Employer's reconsideration motion filed with this court, in essence argues, as Employer had previously asserted before the Board, that the treatment suggested was for Bocalbos's missing teeth, a pre-existing condition that it argues was not compensable.

**31.** Even assuming *arguendo* that a malocclusion pre-existed the accident, based on the record, it was an asymptomatic and latent condition. Analogously, in disability cases, it has been said with respect to an activation of a latent condition, that

> [n]othing is better established in compensation law than the rule that, when industrial injury precipitates disability from a latent prior condition, such as heart disease, cancer, back weakness and the like, the entire disability is compensable, and except in states having special statutes on aggravation of disease, no attempt is made to weigh the relative contribution of the accident and the preexisting condition to the final disability or death. *Apportionment does not apply in such cases, nor in any case in which the prior condition was not a disability in the compensation sense.*

5 A. Larson, *Workers' Compensation Law,* § 59.22(a), at 10–492.361—10–492.368 (1999) (emphases added; footnotes omitted).

treatment in such a manner. The relevant question under HRS § 386–21 is whether the medical treatment proposed is necessitated by the nature of the injury. In this case, the substantial evidence in the record indicates that this is so. If so, then the employer is required to provide compensation for "all" medical treatment required.

## B.

 We also recognize that a contrary interpretation of HRS § 386–21 would conflict with the liberal construction to be given the workers compensation statute in light of its "broad humanitarian purpose." *DeFries v. Association of Owners, 999 Wilder,* 57 Haw. 296, 304, 555 P.2d 855, 856 (1976); *see Akamine v. Hawaiian Packing & Crating Co.,* 53 Haw. 406, 409, 495 P.2d 1164, 1166 (1972). Such an apportionment may unjustifiably result in an employee foregoing needed treatment, as was held in *Granado v. Workmen's Compensation Appeals Bd.,* 69 Cal.2d 399, 71 Cal.Rptr. 678, 445 P.2d 294 (1968). There, an employee appealed the decision of the Workmen's Compensation Appeals Board that apportioned the cost of his medical treatment between his employer and himself because of an uncompensable neck injury suffered prior to an industrial neck injury. The prior neck injury was "asymptomatic and [the employee had been] able to work between the injury ... and the [subsequent neck] injury." *Id.* at 299, 71 Cal.Rptr. 678.

In reviewing a statute similar to HRS § 386–21, the court concluded that the medical payments were not apportionable between the employee and the Board:

> There can be no doubt that medical expense is not apportionable. Section 4600 of the Labor Code states that the employer shall provide such treatment which is reasonably required to cure or relieve from the effects of the injury, and section 4601 of the code provides that "All" of the doctor treatment shall be at the expense of the employer.... So long as the treatment is reasonably required to cure or relieve from the effects of the industrial injury, the employer is required to provide the treatment, and *treatment for nonindustrial conditions may be required of the employer where it becomes essential in curing or relieving from the effects of the industrial injury itself.*

*Id.* (emphases added). In explaining its ruling, the California Supreme Court pointed out that an apportionment rule could result in delaying treatment or in precluding treatment altogether if an employee were not able to pay for his or her share of the required treatment:

> If medical expenses reasonably necessary to relieve from the industrial injury were apportionable, the working[person] who is disabled may not be able to pay his [or her] share of the expenses and thus forego treatment. Moreover, the uncertainties attendant to the determination of the proper apportionment might cause the employers to refuse to pay their share until there has been a hearing and decision on the question of apportionment, and such *delay in payment may compel the injured working [person] to forego prompt treatment to which he [or she] is entitled.*

*Id.* (emphases added).

We agree with the foregoing rationale and therefore, under the circumstances, we regard the apportionment of medical treatment benefits as erroneous and wrong.

## VII.

For the foregoing reasons, we reverse the Board's denial of orthodontic, orthopedic,[32] and prosthodontic treatment in its March 14, 1997 second amended decision and order; and remand the case to the Board with instructions to enter an order awarding Bocalbos such treatment as is consistent with our decision.[33]

---

**32.** The "orthopedic" treatment awarded is limited as set forth in note 28, *supra.*

**33.** Under our disposition of the case, we need not reach other points on appeal raised by Bocalbos.